IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 17, 2019

## STATE OF TENNESSEE v. PRESLEY WILLIAM NAVE, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2016-A-251      Steve R. Dozier, Judge**

_____

### No. M2018-02085-CCA-R3-CD

_____

The Defendant, Presley William Nave, Jr., pled guilty to one count of statutory rape, a Class E felony, and one count of child abuse, a Class D felony, in exchange for a two-year sentence on probation. Following a hearing, the trial court ordered the Defendant to register as a sex offender. The Defendant appeals, arguing (1) that the trial court gave improper weight to the original offenses charged; and (2) that the trial court did not consider factors weighing against placing the Defendant on the sex offender registry. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Dawn Deaner, District Public Defender; Emma Rae Tennent (on appeal); and William Allensworth (at hearing), Assistant District Public Defenders, for the appellant, Presley William Nave, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jeremy D. Johnston, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

This case arises from an incident in which the Defendant, who was then age fifty-five, engaged in sexual acts with a fifteen-year-old victim.[1] According to the Defendant,

_____

[1] It is the policy of this court to protect the identity of minors and victims of sex crimes. We will, therefore, refer to the minor victim in this case as "the victim."

he had known the victim for four or five years and had previously lived in the same apartment complex as the victim's mother. During the relevant time period, the victim's mother and at least two other people were staying at the Defendant's house because they were financially insecure or homeless. The victim, who previously lived with other family members, moved in with his mother one or two weeks prior to the incident.

The January 2016 term of the Davidson County grand jury charged the Defendant with two counts of aggravated statutory rape. See Tenn. Code Ann. § 39-13-506. Both counts related to an incident on October 26, 2015, during which the victim sexually penetrated the Defendant (Count 1) and the Defendant sexually penetrated the victim (Count 2). The indictment specified that the aggravating factor was Defendant's being more than ten years older than the victim.

On June 6, 2018, the Defendant pleaded guilty in Count 1 to statutory rape and in Count 2 to child abuse. See Tenn. Code Ann. §§ 39-13-506, -15-401. The terms of the plea agreement included an agreed-upon two-year sentence of probation on both counts, to be served concurrently, with the issue of whether the Defendant was to be placed on the sex offender registry reserved for the trial court.

The underlying facts of the case presented by the prosecutor at the guilty plea hearing reflected the following:

> On October 30th, 2015, detectives with the Metro [Nashville] Police Department sex crimes unit were notified that the victim, [who was then age fifteen,] . . . disclosed he had engaged in sexual activity with the [D]efendant . . . on or about October 26th, of 2015.
>
> Several days later, the victim was forensically interviewed at the Nashville Children's [A]lliance and disclosed that he and the [D]efendant were watching the Golden Girls in the [D]efendant's bedroom when the [D]efendant began touching the victim on the victim's penis over the top of the victim's clothes. The victim disclosed that the [D]efendant pulled out the victim's penis and the [D]efendant began performing oral sex on the victim. The victim stated that the victim also performed oral sex on the [D]efendant.

At a hearing on October 4, 2018, transcripts of the Defendant's police interview and a recording of the victim's forensic interviews were received as exhibits. The victim's first forensic interview was consistent with the prosecutor's recitation of the

facts at the guilty plea hearing.[2] The victim stated that he had been living with other relatives with whom he argued, and as a result, he went to live with his mother, who was living at the Defendant's house along with several other people. The Defendant had known the victim for four or five years. The victim would watch television with the Defendant in the Defendant's bedroom at night. The October 26, 2015 incident was the first time the Defendant had inappropriately touched the victim, although the victim indicated that the Defendant had discussed sexuality with him previously. The victim added that the Defendant manipulated or bribed him for the sexual acts.

The Defendant's police interview reflected that the Defendant repeatedly denied having discussed sexuality with the victim, other than talking about a girl at school the victim liked. The Defendant noted that he suspected the victim was homosexual because the victim looked at the Defendant and another male housemate "goofy." The Defendant eventually admitted that the victim "grabbed a hold of [the Defendant's] d--k" about one week prior to the interview. According to the Defendant, he and the victim were watching television in the Defendant's bedroom; the Defendant fell asleep; and when he awoke, the victim was lying on the edge of the Defendant's bed and "messing" with the Defendant's penis inside his boxer shorts. The victim's head was near the Defendant's penis, but he did not know if the victim put his mouth on it; the Defendant later said, though, that he thought the victim was performing oral sex on him. The Defendant stated that he told the victim to stop, asked if the victim was crazy, told the victim he was "mixed up," and instructed the victim to go to the victim's mother's bedroom. The Defendant repeatedly denied touching the victim except for "grabbing his a--" playfully around the house. The Defendant also noted that he and the male housemate would engage in sexual banter around the victim, typically commenting on whether they would have sex with people they saw on television. The Defendant noted that he previously sold candy to neighborhood children because he felt sorry for them. The Defendant stated that he engaged in some sexual touching with other men when he was in his early 20s, but that he had only dated women since. The Defendant thought the victim was "experimenting" sexually and commented that the victim had a difficult home life.

Metro Nashville Detective Jarrad Rikal testified that he investigated the allegations of sexual touching between the Defendant and the victim. When Detective Rikal asked the Defendant if "anything . . . unusual happened in way of a sexual nature," the Defendant initially denied that anything happened. Several minutes later, the Defendant stated that "he had woken up and the victim had a hold of his penis. [The Defendant] told [the victim] no, that's not appropriate." Detective Rikal scheduled a forensic interview for the victim, during which the victim disclosed "that there was oral

---

[2] The recording of the second forensic interview either was not included on the disc in the appellate record or the file did not function.

sex . . . by both parties[.]" At the end of a second interview, the victim disclosed that the Defendant attempted unsuccessfully to anally penetrate the victim with his penis.

Detective Rikal's investigation of the Defendant's criminal history reflected a previous rape allegation from 2013. The police report from that incident was received as an exhibit and reflected that on July 14, 2013, a male acquaintance of the Defendant's alleged that the Defendant had drugged and anally penetrated him. Detective Rikal stated that his knowledge of the 2013 incident was based solely upon the police report.

Dr. Steven Montgomery, a forensic psychiatrist and expert in sex offender risk assessment, testified for the defense that he conducted a psychosexual evaluation of the Defendant in August 2018. Dr. Montgomery interviewed the Defendant for one and one-half hours, administered testing, and reviewed the discovery materials in this case. The assessment instruments used were the "ABEL Assessment of Sexual Interest, the Third Version for Men," (AASI-3) and the STATIC-99R risk assessment.

Dr. Montgomery testified that the STATIC-99R assessment was "used to predict sexual recidivism based largely on historical factors" including the offender's age; past sexual and violent offenses; whether the person had been in a romantic relationship for two years or more; the characteristics of the victim, including whether the victim was related to or a stranger to the offender; and the sex of the victim. He stated that the assessment was an "actuary on the statistical models predicting, matching up to who recidivates and who does not over long periods of time" relative to a "wide range of sex offenses," including sex with postpubescent minors. An offender could be classified as "very low[,] . . . below average[,] . . . average[,] and . . . very high." Dr. Montgomery stated that the risk assessment applied to a person who had just been released from custody. He noted that if a person had been in the community for more than five years and had not reoffended, "then that should be taken into consideration in[] evaluating their risk" by halving the risk level.

Dr. Montgomery testified that younger offenders and those with male victims were at higher risk to reoffend. He noted that age was an "important risk factor" and that all adults younger than age thirty-five rated as average risks due to the effect of age. He stated that the lowest possible rating for a person aged thirty-five to fifty-nine was "below average." After age sixty, the lowest possible rating was "very low." Dr. Montgomery said that the STATIC-99R was an established measure and that he "[would] go by the STATIC-99R results unless there [was] significant other information to deviate from that."

The Defendant's STATIC-99R assessed him as an average risk. The Defendant "got minus one" due to his age but accrued two points for the victim's being male and unrelated to the Defendant. Dr. Montgomery agreed that the "average" category applied

-4-

if a person had between one and three risk points and that the Defendant had one total point. He stated, though, that he did not know the scale was weighted or graded such that he would classify the Defendant as "at the bottom" of the average "level." Dr. Montgomery agreed that when the Defendant turned sixty, he would be in the "below average" category. Dr. Montgomery stated that he did not have any information to indicate that the Defendant had reoffended since the 2015 incident; he said that although he would consider the Defendant's good record, "it wouldn't be to the point where you would say his risk is half."

The AASI-3 assessment, a newer measure of risk, was designed to identify pedophiles while "minimiz[ing] false positives." Dr. Montgomery stated that the test detected forty-four percent of pedophiles who took the test. When asked whether the test by extension "miss[ed]" fifty-six percent of pedophiles, Dr. Montgomery stated that although he could not speak to what the test missed, "a large percentage . . . would not be detected on that test." However, once the test had labeled a person as a pedophile, it was eighty-one percent accurate. The AASI-3 consisted of a questionnaire about "a variety of different sexual behaviors as well as rationalizations that people who have abused children might have endorsed." It also included a section containing photographs of differently-aged people wearing bathing suits; the assessment measured the time the offender looked at each photograph to determine the offender's sexual interest in each person pictured. It did not take into account an offender's age or time in the community without reoffending. The AASI-3 also included general questions "that most people would acknowledge." If a person did not admit to "most things that people would normally experience," like getting angry on occasion, the test classified the person as "defensive." The questionnaire also included questions "about a variety of different sexual behaviors and interest[s]," and if a person denied ever having "thought about it, never done it across the board, it's viewed as . . . being somewhat defensive."

Dr. Montgomery acknowledged that the AASI-3 assessment was "somewhat less relevant" to the Defendant's case because he was accused of abusing a postpubescent minor, not a prepubescent child. The Defendant's AASI-3 result reflected that he did not have a "deviant sexual interest in children." The Defendant's ratio of visual reaction time to children versus adults placed him in the medium risk group.

The Defendant reported masturbating beginning in his teenage years to "mental fantasies"; he generally denied using pornography. As an adult, the Defendant reported low sexual desire and masturbating two to three times a week. The Defendant did not "endorse many rationalizations that sex offenders often adopt," and the Defendant agreed on the assessment that sexual contact between adults and minors was wrong.

The Defendant scored in the "highly problematic" range on the Social Desirability Scale, meaning that he sought to portray himself in an "overly positive light" or showed an "unwillingness to respond truthfully to others." The assessment noted that the Defendant had admitted to "sexually molesting [the victim] to the extent reported." The Defendant self-reported negative sexual interest "at the absolute lowest possible rating" to most of the photographs he observed and did not rate any category of person positively. The Defendant "appeare[d] to have attempted to minimize or suppress all sexual interests." The Defendant exhibited "normal sexual interest for a [bisexual] person," including sexual interest in adult and adolescent males and females. Dr. Montgomery noted in the report that although sexual interest in adolescents was considered medically normal, "acting on such interests [was] a serious boundary issue and [was] not considered normal."

Dr. Montgomery testified that the Defendant was generally "somewhat defensive with the testing and the interview" and "not fully forthcoming . . . on some of the questions about his sexual history" and his criminal history. If a patient were dishonest with Dr. Montgomery, his assessment would be less accurate because it was more difficult to assess "systems or whatever functioning [he was] focusing on." Dr. Montgomery used police reports and other evidence to determine whether the Defendant was being deceptive, although he did not have materials to confirm everything the Defendant told him. Dr. Montgomery noted that he could not "detect lies" and did not know whether the Defendant was truthful during his examination. The psychosexual evaluation report stated that the Defendant "was defensive with psychosexual testing. He was not forthcoming in discussing his sexual history. He did not disclose his past history of arrests for criminal activities. The credibility of his self-report was questionable."

For example, the Defendant told Dr. Montgomery that his only sexual partner was his ex-wife, with whom he was married for three years in his early 20s and that he was only sexually attracted to women; the Defendant's statement to police, however, indicated a "period of [bisexual] experimentation" in the Defendant's early 20s that was more consistent with the AASI-3 results and the Defendant's self-reporting on that assessment. Dr. Montgomery stated that it was "somewhat difficult" to evaluate the Defendant's sexual functioning because Dr. Montgomery did not feel the Defendant "was being entirely forthcoming in providing his history."

Similarly, relative to the Defendant's criminal history, Dr. Montgomery stated that "it seemed to be a lot more on the record than what [the Defendant] was originally disclosing." The Defendant initially stated that he had never been arrested for any other offenses, but eventually discussed "being cited for a DUI," which he did not characterize as an arrest. The Defendant noted that he was in a car accident while he had been taking

cough syrup. He later said, though, that he had attended court-ordered Alcoholics Anonymous meetings.

The Defendant thought that he had been arrested in the present case for statutory rape and did not recall to which offenses he pled guilty other than child abuse. The Defendant's criminal record reflected sixteen arrests and two charges for failure to appear. Dr. Montgomery noted "several arrests for fraud- insufficient funds, two arrests for DUI, one for criminal trespassing, and a few for driving on a suspended license." The Defendant was also listed as a victim in several incidents. The Defendant was a suspect in two "forcible sodomy" cases, the 2013 incident and the present case.

Relative to the 2013 police report, Dr. Montgomery said that the Defendant "gave a very different account than the victim did." Dr. Montgomery stated, though, that he did not know if the Defendant was being deceptive regarding this event. In his interview with Dr. Montgomery, the Defendant reported that the complainant in that case was a drug addict whom the Defendant allowed to sleep at his apartment. The Defendant characterized the complainant as having been "all over him," but stated that he did not have sexual contact with him. The Defendant said that the man had used drugs and was having a bad reaction; the Defendant "stayed up the entire night cleaning him" until the man awoke the next morning and left. The Defendant "could not provide a reasonable explanation" as to why he did not call 9-1-1 and stated that he had seen similar reactions before where the drug user had recovered quickly. Dr. Montgomery agreed that in the present case, the Defendant's version of events in his police interview was also somewhat different than that of the victim.

Dr. Montgomery noted that the Defendant may have been "more amenable to sex offender specific treatment once his current legal situation [was] fully resolved" and that defendants were often defensive before the resolution of their cases.

Dr. Montgomery testified that the Defendant did not have any "significant mental disorders" other than possible alcohol use disorder. Dr. Montgomery noted in the report that the Defendant's explanation for his DUI arrest "did not make sense" and that the Defendant did not disclose his two DUI arrests. Problematic alcohol use increased the risk of reoffending.

Dr. Montgomery also noted circumstantial factors in his evaluation, including the Defendant's selling candy to neighborhood children and having the victim watch television with him, "which could be viewed as grooming behavior." Dr. Montgomery also indicated that the Defendant's "taking in this family with financial difficulties . . [who had] young people in their family could be construed" as an attempt to gain access to victims and placing himself in a position of power over them. Dr. Montgomery

-7-

cautioned, though, that he would not classify the Defendant as a pedophile based upon either of these factors alone.

Another risk factor identified by Dr. Montgomery was that the Defendant "appeared to blame the alleged victim for [the] incident[.]" Specifically, the psychosexual evaluation report stated that the Defendant was "very distressed about the current allegations and hi[s] having to agree to things that he maintained never happened." It noted that the Defendant's "insight into his contributions to the situation was limited." The Defendant stated in his interview with Dr. Montgomery that he was "convinced that [a housemate unrelated to the victim] was behind these allegations" because the incident with the victim occurred just before the Defendant was going to evict the people living in his house. The Defendant "did not try to rationalize the allegations other than to definitively state that he did not intentionally engage in this behavior and that he was essentially a victim of this behavior by the minor."

Dr. Montgomery explained that "people working with sex offenders would like for the person to take responsibility for their wrongful actions and acknowledge that adults are always responsible [in] situations dealing with minors." He noted, though, that "some study" indicated that "just because the offender denies the offense or denies involvement doesn't necessarily predict reoffense." Dr. Montgomery further noted that accepting responsibility was no longer the "primary focus of treatment[.]" Dr. Montgomery agreed that the "troubling data points" were based upon his clinical judgment and not upon any empirical studies linking those behaviors to recidivism. He stated that these risk factors were not strong and were not a part of "actuarial risk assessment measures."

In a written order filed October 17, 2018, the trial court ordered that the Defendant register as a sex offender. The court noted that the offenses for which the Defendant was indicted, two counts of aggravated statutory rape, would have carried mandatory placement on the sex offender registry. The court found that although the Defendant pled guilty to lesser offenses, the events to which the Defendant admitted at the plea hearing constituted aggravated statutory rape. The Defendant admitted to unlawful sexual penetration between himself and the victim, and he was unquestionably more than ten years older than the victim. The court found that although this fact was not dispositive, it "weigh[ed] heavily" in favor of requiring sex offender registration.

In addition, the court found that several other factors weighed in favor of having the Defendant register as a sex offender: the Defendant's deceptiveness with both Detective Rikal and Dr. Montgomery, as corroborated by his interviews and outside evidence; the Defendant's "continued defensiveness" during his psychosexual evaluation; and Dr. Montgomery's assessment that the Defendant was at an average risk to reoffend.

The court noted that the Defendant's deceptiveness "cause[d] the [c]ourt concern that the Defendant might be deceptive in his encounters with the public at large in the future[,] such that there could be increased opportunities to reoffend." The court found that the Defendant may not have been "fully honest" in other areas of his psychosexual evaluation, such that he might have had a higher risk of reoffending than was reflected in Dr. Montgomery's report.

The trial court found that although the Defendant's age weighed in his favor and that the statistical risk of reoffending would decrease upon the Defendant's turning sixty, "there is still a significant risk of reoffending according to both Dr. Montgomery's opinion based on the circumstances of the offense and the results of the two assessments[.]" The court noted that it did not place "any weight" on the 2013 rape allegation because no additional proof was offered to establish that it occurred. In light of the circumstances of the case and the additional factors, the court ordered the Defendant to register as a sex offender. The Defendant timely appealed.

ANALYSIS

On appeal, the Defendant contends that the trial court erred by ordering him to register on the Tennessee Sex Offender Registry. Specifically, the Defendant submits (1) that the court gave improper weight to fact that the original charges carried a mandatory registration requirement; and (2) that the court overlooked factors weighing against requiring the Defendant to register, specifically his "not sufficiently high risk to reoffend" as measured by the AASI-3 and STATIC-99R assessments, the time that he had been in the community without reoffending, and Dr. Montgomery's testimony that deceptiveness or unwillingness to admit to the conduct did not bear on recidivism. The State disagrees.

A "[d]efendant's complaint about the requirement that he become a registered sex offender is essentially a challenge to his sentence." State v. Cody Lee Crawford, No. E2014-01868-CCA-R3-CD, 2015 WL 3610551, at *3 (Tenn. Crim. App. June 10, 2015). This court reviews a trial court's order for a defendant to register as a sex offender for an abuse of discretion with a presumption of reasonableness. State v. Ryan Patrick Broaderick, No. M2017-01136-CCA-R3-CD, 2018 WL 4203883, at *7 (Tenn. Crim. App. Sept. 4, 2018); see Crawford, 2015 WL 3610551, at *3-4. When determining whether a defendant should register as a sex offender, the trial court "must consider 'the facts and circumstances surrounding the offense' and may consider any additional relevant factors" such as a psychosexual evaluation, a presentence report, and any other facts deemed relevant by the court. Broaderick, 2018 WL 4203883, at *8-9.

In this case, the Defendant pled guilty to one count of statutory rape, a Class E felony. See Tenn. Code Ann. § 39-13-506(d)(2)(A). Tennessee Code Annotated section 39-13-506(d)(2)(B) provides as follows:

> In addition to the punishment provided for a person who commits statutory rape for the first time, the trial judge may order, after taking into account the facts and circumstances surrounding the offense, including the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement, that the person be required to register as a sexual offender pursuant to title 40, chapter 39, part 2.

The trial court provided sufficient articulation of its reasons for requiring the Defendant to register. See State v. Bise, 380 S.W.3d 682, 705 n.41 (reiterating that "the trial court is in a superior position to impose an appropriate sentence and articulate the reasons for doing so"). Therefore, the trial court's decision is reviewed for an abuse of discretion with a presumption of reasonableness.

Although the Defendant characterizes the trial court's reasoning as placing undue weight on the offense for which the Defendant was indicted, the court simply considered the facts to which the Defendant admitted at the guilty plea hearing—the facts and circumstances surrounding the offense. Those facts clearly established that the Defendant committed aggravated statutory rape. The court was required by statute to consider the circumstances of the offense, as well as the Defendant's negotiating an advantageous plea agreement. We do not think that the court abused its discretion by according heavy weight to a factor it was mandated to consider. Similarly, it was not improper for the court to consider that aggravated statutory rape is a mandatory registration offense.

Moreover, we disagree that the court applied a "blanket policy" based solely upon the fact that the indicted offense would have required registration. The court stated that it considered other factors weighing in favor of the Defendant's registering as a sex offender—namely his deceptiveness and risk to reoffend—as well as a factor weighing in the Defendant's favor, his age. The court specifically stated that its findings regarding the circumstances of the offense, including mandatory registration for the indicted offenses, were "not dispositive."

The Defendant's remaining argument relates to how the trial court weighed positive and negative factors in making its determination. It is not the province of this court to reweigh evidence on appeal or substitute our judgment for that of the finder of fact. The Defendant is not entitled to relief in this regard.

-10-

We note, though, that both risk assessments rated the Defendant as a higher risk to reoffend than other similarly situated individuals his age. This would remain true even after the Defendant turned sixty. Dr. Montgomery noted that until five years had passed, Dr. Montgomery would not halve the Defendant's risk level. The trial court's interpretation of the psychosexual evaluation does not reflect an abuse of discretion.

Similarly, although Dr. Montgomery testified that a defendant's unwillingness to admit to the alleged conduct was, by "some" studies, not relevant to the risk of reoffending, he also testified that the Defendant's deceptiveness affected Dr. Montgomery's ability to assess the Defendant's risk level accurately. Even after entering his plea, the Defendant did not admit to having engaged in the conduct to which he pled guilty and blamed the minor victim for the encounter. The Defendant also misrepresented his sexual and criminal history to Dr. Montgomery, and he minimized or eliminated his stated sexual preferences in the AASI-3 assessment. It was not an abuse of discretion to find that the Defendant's continual deception presented a risk to the public weighing in favor of registration.

Accordingly, we surmise that the trial court did not abuse its discretion in requiring the Defendant to register as a sex offender. The Defendant is not entitled to relief.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-11-